## V. W. HALE v. W. R. HOLLON ET AL.

### Decided February 25, 1897.

**1. Sale of Mere Expectancy.**

A mere expectancy of inheritance, as heir or next of kin of one living, may be, in equity, the subject of sale and conveyance. (P. 429.)

**2. Same—Rights of Creditors.**

In the absence of contract rights, or of fraud in such transaction, judgment creditors of the heir have no such rights in the estate in expectancy as will prevent such disposition of it. (P. 430.)

**3. Same—Consent of Ancestor.**

The fact that such contract was without the knowledge or consent of the ancestor or owner, who was non compos mentis, and unable to consent thereto, will not avoid such conveyance by the heir. (Pp. 430 to 437.)

**4. Same—Case Questioned.**

The doctrine of Boynton v. Hubbard, 7 Mass., 111, that the consent of the ancestor was necessary, questioned, but held inapplicable to cases where such ancestor was incapable of consent. (Pp. 433 to 435.)

**5. Case Approved.**

The rulings of the Court of Civil Appeals in this case (Hale v. Hollon, 35 S. W. Rep., 843) approved.

ERROR to Court of Civil Appeals, Third District, in an appeal from McLennan County.

*A. C. Prendergast, R. W. Andrews* and *Hale & Hale,* for plaintiff in error.—The instrument read in evidence to show title in appellee was inadmissible and void for the following several reasons:

It is void, and conveyed no present title, none being in the grantor, and it only attempted to convey what interest he then had, which was none. Pennock v. Coe, 23 How. (U. S.), 128; Davidson v. Wallingford, 30 S. W. Rep., 289.

The deed is void as being contrary to and against public policy, and as such, not admissible in evidence to show title in any one. The record shows that S. E. Hollon was non compos mentis; that D. P. Hollon was her guardian, and as such had charge of her person and estate; that she was living at the time with W. R. Hollon, and knew nothing about the transaction, and was not capable of giving her assent to the conveyance, and that all this was well known to both grantor and grantee. Mayhew v. Insurance Co., 87 Texas, 171; Goldbaum v. Blum, 79 Texas, 640; McClure v. Raben, 36 Am. St. Rep., 558; Greenhood, Public Policy, 175; In Re. Garcelon, 43 Am. St. Rep., 140.

The filing, indexing and recording of the abstracts of judgments under which plaintiff claims title to the land in controversy being prior to the conveyance from D. P. to W. R. Hollon and being notice to him, constituted a prior right in equity, and under the registration statute is paramount to any right or title which enured to W. R. Hollon by reason of the conveyance to him made by D. P. Hollon. Rev. Civ. Stats., Texas, art. 3159; Barron v. Thompson, 54 Texas, 237; Grace v. Wade, 45 Texas, 522;

Folts v. Ferguson, 77 Texas, 302; Mainwaring v. Templeman, 51 Texas, 205; Firebaugh v. Ward, 51 Texas, 413; York v. McNutt, 16 Texas, 14; Gage v. Neblett, 57 Texas, 374; Baird v. Trice, 51 Texas, 560; Lewis v. Cole, 60 Texas, 343; Wright v. Straub, 64 Texas, 66; Pennock v. Coe, 23 How., (U. S.) 128; 1 Black on Judgments, sec. 451; Lewis v. Johnson, 68 Texas, 449; Ford v. Unity Church Society, 120 Mo., 498; Cargill v. Kountze, 86 Texas, 386; Coombs v. Jordan, 22 Am. Dec., 248; Baker v. Morton, 12 Wall., 158; Conard v. Ins. Co., 1 Peters, 443; Massingill v. Downs, 7 How., 765; 1 Jones on Mortgages, sec. 679; Cook v. Banker, 50 N. Y., 655; 1 Jones on Liens, sec. 96.

In a supplemental brief counsel for plaintiff in error cited the following additional authorities: Boynton v. Hubbard, 7 Mass., 112; Read v. Mosby, 87 Tenn., 759; 3rd. Pomeroy's Equity, secs. 1236 and note 1, 1288, 953; Rawle on Covenants, secs. 259, 298-250; Dodd v. Williams, 3 Mo. App., 278; Bates v. Foster, 59 Me., 157; 125 Ind., 139.

Clark & Bolinger, for defendant in error.—The instrument read in evidence to show title in appellee was admissible for that purpose, it being in legal effect an assignment of the expectant interest of D. P. Hollon in the estate of his sister, S. E. Hollon, which interest was the subject of assignment in equity and conveyed in a lawful manner a substantial interest in expectancy, the same being fairly made and not against public policy. Such transfers operate in presenti and pass a present title cognizable in equity. Nimmo v. Davis, 7 Texas, 26; Fitzgerald v. Vestal, 4 Sneed, (Tenn.) 258; 1 Am. and Eng. Encycl. Law, 830-831; Bispham's Eq., 5th ed., 241 et seq., and numerous authorities cited and discussed in notes; 1 Beach Mod. Eq. Juris., 327; 1 Pomeroy Eq., 168, 1403, note; In re. Fritz Estate, 160 Pa. St., 156; Kinyon v. Kinyon, 72 Hun., 452; Shephard v. Clark, 38 Ill. App., 66; Taylor v. Palmer, 31 Cal., 240; Jenkins v. Stetson, 9 Allen, 128; Hannon v. Christopher, 34 N. J. Eq., 459; Groot v. Story, 41 Vt., 533; Tailby v. Official Receiver, 13 App. Cas., 531; Wright v. Wright, 1 Ves., Sr., 411; Bennett v. Cooper, 9 Beavan, 252.

The mere fact that the assignment from D. P. Hollon to W. R. Hollon was in the shape of a deed purporting to convey an interest in land does not affect the validity of the assignment of the property rights enuring to D. P. Hollon, as heir of S. E. Hollon. The form of the assignment is immaterial. Shephard v. Clark, 38 Ill. App., 66.

DENMAN, ASSOCIATE JUSTICE.—S. E. Hollon, who was all her life non compos mentis, died October 15, 1894, at the age of about 68 years the owner of valuable real estate situated in McLennan and other counties in Texas, which she had inherited some years before, leaving as her heirs her brothers, D. P. Hollon and W. R. Hollon, and the children of a deceased sister, said D. P. Hollon having been her guardian for some years. Prior to the 25th day of June, 1894, various judgments were rendered against D. P. Hollon, and on that date he executed to his brother, W. R. Hollon, a conveyance of his "entire interest in the estate of S. E.

Hollon, of whatsoever kind and nature she is now in possession of or may hereafter become possessed of," which conveyance contained a general warranty of title and was duly filed for record in McLennan County on the day of its execution. A few days after the death of S. E. Hollon executions, issued upon said judgments, were levied upon an undivided one-third interest in the lands owned by S. E. Hollon at the date of her death, as the property of D. P. Hollon, and at the sales under said executions the same was purchased by plaintiff in error, V. W. Hale.

On the tenth day of January, 1895, said Hale brought this suit against D. P. and W. R. Hollon and in addition to the facts above stated alleged that said transfer from D. P. to W. R. Hollon was executed for the purpose of hindering, delaying and defrauding the creditors of D. P. Hollon, who was then insolvent, and for the purpose of defrauding the said S. E. Hollon, the same being made without her knowledge or consent,— all of which was well known to W. R. Hollon; wherefore he prayed for a cancellation of said instrument as being a cloud upon his title, acquired as purchaser at the execution sales aforesaid. W. R. and D. P. Hollon answered by general denial and W. R. Hollon answered specially, denying all knowledge of insolvency of D. P. Hollon or of any fraud or intent to hinder or delay creditors in the execution of said instrument, alleging that he purchased the interest of D. P. Hollon in the estate of their sister, S. E. Hollon, in good faith, paying value therefor, and prayed for a cancellation of plaintiff's deeds as a cloud upon his title thereto.

On trial before the court without a jury judgment was rendered that plaintiff take nothing by his suit and that the deeds from the sheriff to plaintiff be cancelled as a cloud upon the title of defendant, W. R. Hollon. The trial judge filed no conclusions of fact or law. The Court of Civil Appeals in affirming the judgment, upon conflicting testimony, find as a fact "that the transfer (from D. P. to W. R. Hollon above mentioned) was not made with intent to defraud creditors of D. P. Holland."

It is assigned as error here that the Court of Civil Appeals erred in holding that D. P. Hollon could, as against his judgment creditors, make a valid conveyance of a naked expectancy without the knowledge or consent of S. E. Hollon.

The first question involved in the assignment is, could D. P. Hollon contract with reference to the mere expectancy of inheritance from his sister in such way that by virtue of such contract any property he might inherit from her would pass to W. R. Hollon? Whatever may be the rule at law it is well settled as stated in Spence's Eq. Jurisdiction, vol. 2, p. 865, that "a naked possibility or expectancy of an heir to his ancestor's estate, or even of the anticipated rights of a person as next of kin, may be the subject of contract in equity, which will be equivalent to an assignment of the property if and when it shall fall into possession." Nimmo v. Davis, 7 Texas, 26; Richardson v. Washington & Costley Bros., 88 Texas, 339; Tailby v. Official Receiver, 13 App. Cases, 523; Mastin v. Marlow, 65 N. C., 695; Jenkins v. Stetson, 9 Allen 128; Fritz's Appeal, 160 Pa. Sta., 156.

The second question involved in the assignment is conceding that D. P. Hollon could bind himself by such a conveyance, was same binding upon his judgment creditors? If it be admitted that creditors in the absence of contract have any legal or equitable right to look to such expectancies for satisfaction of their claims and therefore have the right to insist that the debtor do not dispose of same with intent to defraud them, upon which question we do not deem it necessary to express an opinion, still, the Court of Civil Appeals in support of the judgment of the trial court having found as a fact that the conveyance was not made with intent to defraud creditors, such finding is conclusive upon us, and we must therefore hold as a matter of law that the conveyance is as binding upon such creditors as upon the debtor D. P. Hollon. Fritz's Appeal, 160 Pa. St., 156; Fitzgerald v. Vestal, 4 Sneed, 258; Read v. Mosby, 87 Tenn., 759; Stover v. Eycleshimer 3 Keyes (N. Y.), 620.

The third question involved in the assignment is, conceding that such an expectancy is a subject matter of contract in equity, and that there was no actual fraud in the execution of the instrument from D. P. to W. R. Hollon as above indicated, does the mere fact that S. E. Hollon did not assent thereto, she being without capacity to assent, prevent its having any binding force or efficacy? The doctrine of McClure v. Raben, 133 Ind., 507, answers this question in the affirmative, and that of Mastin v. Marlow, 65 N. C., 695, in the negative. We have been able to find no other direct authority. Doubt as to how this question should be answered was the ground upon which we granted the application for writ of error. The rules permitting and regulating dealings by expectants with reference to such expectancies, being of common law origin, were adopted by us along with the body of that law by act of Congress of the Republic of Texas, approved January 20, 1840, which provided "that the common law of England (so far as it is not inconsistent with the Constitution or the acts of Congress now in force) shall, together with such acts, be the rule of decision in this republic, and shall continue in full force until altered or repealed by Congress." The inquiry then naturally presents itself, what was the common law rule as recognized in the courts of England at that time upon the question under consideration; for since there has been no statute or direct decision in this State in reference thereto it would seem that such rule should be entitled to much respect at this late day as being the probable basis of many titles to land.

While the courts of equity in England have long recognized and enforced contracts by expectants in reference to such expectancies, they have from the earliest period viewed them with great suspicion. This arose first from the fact that such expectants, being often young, inexperienced, hard pressed or of extravagant habits, are inclined to sacrifice their future interests to meet their present real or imaginary wants, thus rendering them easy victims of the schemes of that cunning and pernicious element who too often mark them as their prey; and second

from.the fact that such transactions are looked upon as a species of fraud upon the ancestor or person from whom the expectancy is to be received in that they, being usually of a secret nature, tend to destroy or lessen his influence and control over the expectant by giving him independent means of gratifying his desires, and in that the ancestor would often be thereby deluded into virtually leaving his property, not to the persons intended, but to the stranger who had so insidiously undermined his domestic authority and encompassed the ruin of the intended beneficiary of his fortune.  Therefore, as early as the leading case of Chesterfield v. Janssen, 2 Ves., 158, 1 Atk., 339, decided in 1750, we find the doctrine firmly established in said courts that whether the suit be by the holder of the contract to enforce specific performance or by the expectant to be relieved from the terms thereof, the prima facie presumption was that the same was a fraud both upon the expectant and the ancestor or party from whom the expectancy was to be derived, and therefore the burden was imposed upon the holder to rebut such presumption in order in one case to obtain the relief prayed for by him or in the other to defeat that sought by the expectant.  We are not called upon in this case to determine the character of proof the holder was required to produce in order to rebut such presumption, except as to whether it was necessary to show the consent of the ancestor or person from whom the expectancy was to be derived.  Doubtless the absence of such assent, where the whole evidence did not clearly show a fair and just transaction, was considered by the courts as most cogent evidence of fraud entitling the expectant to relief, but we have been able to find no English case where its mere absence has been held to authorize such relief, if the proof offered showed a transaction otherwise free from fraud, unfairness and inadequacy of consideration.  Indeed, most of the cases seem to proceed upon the assumption that there was no such assent; so much so that Lord Brougham erroneously considered that no relief could be granted against the contract if it were present.  Earl of Aylesford v. Morris, 8 Ch. App. Cas., 491.  In Beckley v. Newland, 2 P. Will., 182, decided in 1723, Beckley and Newland having married sisters who were cousins and presumptive heirs of Mr. Sturgis, a very wealthy man who had made and revoked several wills, entered into an agreement whereby they agreed to divide equally all property which Mr. Sturgis might give to either of them by last will.  Subsequently Mr. Sturgis made a will leaving to Newland the greater portion of his property, and after the death of Mr. Sturgis Beckley filed his bill to enforce the specific performance of the agreement for an equal division.  It was objected by Newland that the agreement ought not to be enforced because it tended to defeat the purpose of the testator, who in all probability would have given nothing to either of the parties to the agreement in case he could have foreseen that his disposition was to be thus frustrated.  Lord Chancellor Macclesfield, however, enforced the agreement, holding that it could not be unreasonable to agree to divide the property according to what would have been the course of descent in case

Mr. Sturgis had died intestate. In this case there was clearly a concealment of the agreement from Mr. Sturgis, and its purpose and effect were to encompass the defeat of his will, and pass the property in a different way from that intended by him, and to render the contracting parties more independent of his wishes than they otherwise would have been, yet the learned Chancellor, considering upon the whole case that the agreement was not inequitable, enforced its performance notwithstanding the concealment from and want of assent of Mr. Sturgis. In Earl of Chesterfield v. Janssen, supra, though the agreement contemplated that the transaction should be kept secret from the Dutchess of Marlborough, Justice Burnett, though declining to decide whether under all the circumstances the agreement should have been relieved against if it had not been subsequently confirmed by the expectant, said: "It may be thought too rigid to say, that an heir shall not borrow upon an expectancy; as some persons are so niggardly and sparing to their children, that a poor heir may starve in the desert, with the land of Canaan in his view, if he could not relieve himself this way;" and Lord Hardwicke, after delivering a dictum which has ever since been referred to as the most lucid exposition of the law relating to such contracts to be found in the books, proceeded to dispose of the case by holding that the bond was not void at law, but, at most, merely voidable in equity, and therefore, since the expectant had ratified it after the death of the dutchess no relief could be had. In Earl of Aylesford v. Morris, 8 Ch. App. Cas. (L. R.) 484, decided in 1871, the expectant applied for relief from a most unconscionable bargain, which had been carefully concealed from his father. Lord Chancellor Selborne, in passing upon the case, said: "In the cases of catching bargains of the expectant heirs, one peculiar feature has been almost universally present * * * the victim comes to the snare * * * excluded, and known to be excluded, by the very motives and circumstances which attract him, from the help and advice of his natural guardians and protectors, and from that professional aid which would be accessible to him, if he did not feel compelled to secrecy; he comes in the dark, and in fetters, without either the will or the power to take care of himself, and with nobody else to take care of him. Great judges have said that there is a principle of public policy in restraining this; that this system of undermining and blasting, as it were, in the bud the fortunes of families, is a public as well as a private mischief; that it is a sort of indirect fraud upon the heads of families from whom these transactions are concealed, and who may be thereby induced to dispose of their means for the profit and advantage of strangers and usurers, when they suppose themselves to be fulfilling the moral obligation of providing for their own descendants. Whatever there may be in any such collateral considerations, they could hardly prevail if they did not connect themselves with an equity more strictly and directly personal to the plaintiff in each particular case." After thus disposing of the fact of non assent of the ancestor as being insufficient of itself to authorize relief,

he proceeded to show that the circumstances attending the transaction, including the concealment from the father, and the unconscionableness of the bargain, were such as to bring the case within the rule, and thereupon entered a decree in the usual form in such cases granting relief against the terms of the contract if the expectant, within a given time, should repay defendant the money advanced, with lawful interest, in default of which his bill should be dismissed. Thus it seems clear that, while courts of equity in England have always considered concealment from, or non assent of, the ancestor as cogent evidence of fraud, when connected "with an equity more strictly and directly personal to the plaintiff in each particular case," they have never deemed it sufficient of itself to authorize relief against the contract, where the person dealing with the expectant has shown in rebuttal of the presumption above discussed, that the transaction was otherwise free from fraud, unfairness and inadequacy of consideration; and it is important to note, as said by Lord Selborne in the opinion above cited, "fraud does not here mean deceit or circumvention; it means an unconscientious use of the power arising out of these circumstances and conditions." They appear to have proceeded upon the logical idea that, having recognized the right of an expectant to contract with reference to such expectancies, such contract, when shown under the strict scrutiny of a court of equity to be otherwise unobjectionable, cannot be set aside for mere want of the assent of one not a party thereto.

Having ascertained as best we could the rule recognized in England at and since the enactment of our statute adopting the common law, we will examine the cases asserting a contrary doctrine in this country. In Boynton v. Hubbard, 7 Mass., 111, decided in 1810, it was held, as we understand the opinion by Parsons C. J., that a contract by an expectant to convey a portion of his expectancy, though free from fraud as between the contracting parties, is void when made without the assent of the ancestor, on the sole ground that it is a fraud upon such ancestor, productive of public mischief, and against sound public policy. The opinion seems to confuse the powers and jurisdictions of courts of law and equity, and is difficult to understand. It is severely criticised by the editor in his notes to said report, wherein he maintains that, the proceeding being one at law, the contract was erroneously held void, as it "was undoubtedly good at the common law, and voidable only in a court of equity." The opinion is not sustained by the cases cited therein. Though the learned Chief Justice said, in the course of his opinion, that the fairness of the transaction had been settled by the verdict, the reported facts show that the bargain was a most unconscionable one, and it may be that opinion was influenced more by that fact than the report of the case would indicate. We do not find any case in that State involving the precise question whether a contract otherwise fair and equitable, as between the parties, was void merely for want of the assent of the ancestor. This case is dissented from in an opinion rendered by the Supreme Court of North Carolina in 1859,

wherein such a contract was upheld, the court through Battle, J., saying: "It is true that the policy of giving effect to contracts of this kind against expectant heirs has been doubted by very eminent judges; and C. J. Parsons, in Boynton v. Hubbard, 7 Mass. Rep., 112, refused to sanction an assignment made by a nephew in the lifetime of his uncle, of his expectant interest in that uncle's estate. But the doctrine is now too well established to be disregarded, and the authorities to which they refer, fully sustain White & Tudor in saying that 'a mere expectancy, as that of an heir at law to the estate of his ancestor, or the interest which a person may take under the will of another then living, or the share to which such person may become entitled, under an appointment, or in personal estate as presumptive next of kin of a person then living, is assignable in equity for a valuable consideration; and where the expectancy has fallen into possession, the assignment will be enforced.' " (McDonald v. McDonald, 5 Jones' Eq. [N. C.] 211.) In Alves v. Schlesinger, 81 Ky. 290, which was a suit in equity decided in 1883, in a very brief opinion without discussion or citation of authorities, the doctrine is announced for the first time, as far as we have been able to discover from the reported cases, that an agreement entered into by a brother, for a valuable consideration, to convey to his sister all the right, title and interest that he then had, or might thereafter acquire by gift, devise, or descent from his mother in certain lands, and whereby he agreed to execute and deliver to his sister all necessary and proper deeds to perfect the title when it could be done, or his interest in the property might be determined, the agreement being made at the instance of the mother, and without any fraud or unfairness as between the brother and sister, conferred no right whatever upon the sister, and could not be enforced for the reasons (1) that the mother's assent was merely verbal, and she did not thereby deprive herself of any interest in the property in favor of the daughter, and (2) that the son, during the life of the mother, "had no right or interest therein, legal or equitable, vested or contingent. In fact, what he sold and undertook, or agreed to convey, had neither actual or potential existence." This being a proceeding in equity, it is difficult to understand by what process of reasoning the learned judge who delivered the opinion reached the conclusion, under the authorities, that the son could not in equity bind himself by contract to convey his expectancy to the sister, or that any more than a verbal assent from the mother could be necessary in any event. We have been able to find no decided case which supports this decision, and, as we have seen above, the settled law elsewhere is to the contrary. Even Boynton v. Hubbard clearly would have been decided differently if the verbal assent of the uncle had been given. The effect of the decision was to ignore the son as a contracting party, and render it necessary for the mother, who was not a party to the contract, to have made such an agreement as would have bound her to carry out the contract between the son and daughter. In McClure v. Raben, 125 Ind., 139, and 133 Ind., 507, cited above, the court, relying

for authority upon Boynton v. Hubbard, Alves v. Schlesinger, supra, and Hart v. Gregg, 32 Ohio St., 512, held, as above indicated in the beginning of the discussion of this question, that the assent of the ancestor was absolutely essential to the validity of the contract, and that the fact that she was non compos mentis, and therefore unable to assent, did not change the rule, and therefore held the deed made by the expectant void for want of such assent. The court say that the Ohio case is directly in point. We have examined that case, and are of opinion that it has no bearing whatever upon the question. There plaintiff, holding an ordinary deed without warranty from one Gordon to a tract of land, brought suit to recover the same against the party in possession, and it was shown on the trial that at the date of the deed the title was in the father of Gordon, and not in him, but that the father had died before the institution of the suit, leaving said grantor Gordon as his only heir; and the court held that the title inherited by the son from the father, after the execution of the deed, did not pass by estoppel to the plaintiff, for the reason that there was no warranty, nor was there any recital of any fact in the instrument which would estop the grantor from asserting an after-acquired title. It was not a case where the son had attempted to convey an interest which he might thereafter derive from his father by inheritance or otherwise. The above are all the authorities we have been able to find holding that the assent of the ancestor is necessary to the validity of a contract otherwise unobjectionable.

On the other hand, following the principles laid down in the English cases above discussed, such contracts have been upheld, when shown to be fair and equitable, though the assent of the ancestors did not appear, but, on the contrary, the inference from the circumstances stated is that the transactions were without their knowledge, in the following cases: Fritz's Appeal, 160 Pa. St., 156; Stover v. Eycleshimer, 46 N. Y., 620; Steele v. Frierson, 85 Tenn., 430; McDonald v. McDonald, 5 Jones' Eq., (N. C.) 211. It is true that in none of these cases does it appear that any contention was made that the absence of the assent of the ancestor invalidated the contract, but in the last case cited from North Carolina it is clear that the question was squarely before the court from the fact that, as above indicated, the opinion of Chief Justice Parsons in Boynton v. Hubbard, where that was the sole question, was disapproved. In Mastin v. Marlow, 65 N. C., referred to in the beginning of this discussion, the facts of the case appear to be of the same character as those in McClure v. Raben, supra. The bill for specific performance alleged that the ancestor was non compos mentis at the time two of his children executed the instrument sought to be enforced, so that it is clear that the court had before it the fact that there was no assent on the part of the ancestor, but still it was held, referring to McDonald v. McDonald, supra, that the suit was improperly dismissed for want of equity in the bill, the court saying: "The power of an heir expectant to bind himself by contract, in regard to what may

descend to him by the death of the ancestor, is taken to be settled. In some cases, when the consideration is fair and adequate, and no undue advantage has been taken, the decree is for specific performance. In other cases, when advantage has been taken of the necessity of the party, the contract is held as a security for the return of the money actually advanced, together with interest, while in other cases, all relief is refused, because of fraud and imposition. Under which of these three classes the case in hand will fall it is not for us now to say, as the plaintiffs will no doubt ask the privilege of amending the bill, so as to make the allegation in respect to the price paid, and the fairness of the transaction more distinct and direct."

While, as before stated, there has been no direct decision in this State upon the question, we do not feel at liberty to leave unnoticed the remark of Justice Wheeler, in Nimmo v. Davis, 7 Texas, 26, which was a case upholding a voluntary partition of property made by the life tenant and remaindermen during the life of the former. In course of the opinion rendered in 1851, that learned jurist, after referring to the right to contract with reference to expectant or future interests as settled law, said: "There is, however, this restriction upon the dispositions of heirs dealing with their expectancies, and reversioners and remaindermen dealing with property already vested in them; that it is incumbent on the party dealing with them 'to make good the bargain,'— that is, to show that the dealing is fair, and for an adequate consideration." When analyzed, this will be found to be probably the clearest, most concise, and at the same time the most comprehensive statement of the rule, as applied in the courts of equity in England, to be found in the books, but it does not agree in all respects with some of the decisions in this country. It places "heirs dealing with their expectancies" upon the same footing with "reversioners and remaindermen dealing with property already vested in them," as has always been the case in England (Earl of Aylesford v. Morris, 8 Ch. App. Cas. L. R. 497,) but not in some of the courts of this country. It imposes the burden of proof on the holder of the contract "to make good the bargain," quoting the favorite expression of the English judges. It interprets the quotation to mean just what has always been its construction in England, that is that the purchaser must show not only that the "dealing is fair," but also that he paid an "adequate consideration," the rule being well settled in England that the purchaser, in order "to make good the bargain," must not only show that he perpetrated no actual fraud, but that he did not make an inequitable deal, the courts being so strict on this question as to adequacy of consideration that an act of parliament was finally passed to relieve against its supposed harshness in certain cases. Earl of Aylesford v. Morris, supra. It does not, in mentioning the restrictions thrown around such transactions by law, follow Chief Justice Parker, with whose opinion in so noted a case, rendered forty years before we must assume the court was familiar, in going beyond the rule as then long well established in England by requiring, in

addition, the assent of the ancestor. In view of the long established rule in England, at the date of our statute adopting the common law, holding such transactions valid in the absence of the assent of the ancestor, when shown to be otherwise unobjectionable, under the strict scrutiny of a court of equity, notwithstanding the presumption of fraud indulged against them, and merely voidable when not so shown, taken in connection with the early, and to this date unchallenged, remarks of Justice Wheeler above quoted, a court should long hesitate now before adopting the rule laid down by Chief Justice Parsons in Boynton v. Hubbard, holding absolutely void, as contrary to public policy, solely on account of the non assent of the ancestor, every such transaction had in this State since 1840, no matter how just and fair in other respects. Though we do not feel called upon by the facts of the case before us to determine whether the transfer in this case would have been valid had S. E. Hollon been sane, we have deemed it necessary to say this much in order to prevent our disposition of this case, upon what might otherwise be considered an exception to the rule laid down in Boynton v. Hubbard, from being taken as an approval of such rule.

The transaction between D. P. and W. R. Hollon having been found by the Court of Civil Appeals, in face of the presumption of fraud indulged in such cases, to have been free from same, it could not even have been held voidable as a matter of law under the English rule, merely for want of the assent of S. E. Hollon, and we are of the opinion that, even under the rule of Boynton v. Hubbard, the want of her assent, she being non compos mentis, would not render it void. In such a case the reason of the rule fails; for she having no capacity, either to exercise any influence or control over the expectant, or to change by will or otherwise the course of descent of her property, no moral or legal right of hers was invaded by the transaction between her brothers, and hence it could be no fraud upon her. Such a case, in our opinion, should be held an exception to, or, rather, not to be within the rule of Boynton v. Hubbard. We must therefore overrule the assignment of error above stated, and being of opinion that the Court of Civil Appeals correctly disposed of the various other assignments, we deem it unnecessary to discuss them again here.

The judgment will therefore be affirmed.

*Affirmed.*