PERRY v. SMITH et al.   (No. 165–3164.)

(Commission of Appeals of Texas, Section B. June 1, 1921.)

1. Deeds ☞166—Consent to placing mechanic's lien upon property held not waiver of condition in deed.

Consent by a grantor that grantee place a mechanic's lien upon the land was not a waiver of a condition in the deed that a gin and mill be constructed and operated, the company placing the mechanic's lien upon the land being charged with knowledge of the conditions in the deed, and that its lien was subject to be defeated by a breach of such condition.

2. Deeds ☞156—Right of re-entry after condition subsequent broken not assignable at common law.

The right of re-entry after condition subsequent broken is not assignable under the English common law.

3. Deeds ☞156—Right of re-entry after condition subsequent broken assignable.

The question of assignability of the right of re-entry after condition subsequent broken should be governed by the same rule which is applied to the assignability of an interest in land in the adverse possession of another, and the right of re-entry after condition subsequent broken is assignable in view of Rev. St. 1911, art. 7733(4), notwithstanding the act of 1840, which makes the common law of England the rule of decision in the state.

Error to Court of Civil Appeals of Eighth Supreme Judicial District.

Action by L. H. Perry against Sidney Smith and others. From a judgment of the Court of Civil Appeals (198 S. W. 1013) affirming a judgment of the trial court, the plaintiff brings error. Reversed and rendered.

W. W. Moores, of Stephenville, for plaintiff in error.
Pittman & Taylor and J. A. Johnson, all of Stephenville, for defendants in error.

McCLENDON, P. J. On November 12, 1912, S. N. Keith and wife conveyed, for the recited cash consideration of $10, unto Sidney Smith, three acres of land in Erath county, subject to certain conditions, among which were that two acres of the land were to be used by the grantee for gin and mill purposes only, upon which the grantee was to erect a gin and mill building of certain capacity and within a certain time, and providing that, if for any cause the gin and mill be not erected or cease operation on said premises, the land thereby conveyed should revert to the grantors. Smith went into possession, and in January, 1913, made a contract with Higginbotham Company to construct the improvements required under the deed, for which a mechanic's lien was given. In May, 1914, Smith and wife conveyed the land and improvements to Higginbotham Company, in consideration of the debt thus created, which company in turn sold the land to one Holt. The condition for keeping the gin and mill in operation was breached, and after the breach, but before re-entry, on April 1, 1915, Keith and wife conveyed the land to L. H. Perry. This suit was brought by Perry against Smith and his vendees in trespass to try title to recover the land conveyed, upon the ground that the title had reverted to Keith and wife, and that Perry by his deed from the latter had succeeded to their rights. The cause was tried in the district court without a jury, and judgment was rendered for defendants, the court finding that the conditions above named had been broken, but that Keith had waived his right to insist upon the condition on account of having known of the execution of

the mechanic's lien to Higginbotham Company and having verbally consented to its being placed upon the land. The Court of Civil Appeals affirmed this judgment, upon the holding that the right of re-entry after condition subsequent broken is not assignable, and therefore no title passed by the conveyance from Keith and wife to Perry. 198 S. W. 1013.

The case presents two questions for determination: First, whether the trial court's holding that the condition in the deed was waived is supported by the evidence; and, second, whether the English common-law doctrine that the right of re-entry after condition subsequent broken is not assignable is in force in this state.

[1] The only testimony tending to show a waiver of the conditions in the deed is to the effect that after the execution of the deed, and before the improvements were put upon the property, Keith knew of and consented to the placing of a mechanic's lien thereon. We are unable to conclude that such fact amounted to a waiver of the condition. There is no intimation that Keith agreed that the condition would not be insisted upon, or that the lien should be other than subordinate to the title acquired by Smith under his conveyance. At the time this lien was created, no breach of the condition had occurred, and the debt secured by the lien was incurred for the purpose of carrying out the terms of the condition. Higginbotham Company and those claiming under it were charged with knowledge of the conditions in the grant to Smith, and its lien upon the real estate was subject to be defeated by a breach of the same condition which would defeat the title acquired by Smith under his deed. The bare fact of knowledge of and consent to a lien upon the property would not, in our opinion, amount to an estoppel or waiver, in so far as conditions not then broken were concerned.

[2] The second question presents no little difficulty. The Court of Civil Appeals has correctly announced the rule under the English common law. Whether that doctrine is in force in this state under the act of 1840, which makes the common law of England the rule of decision in this state, is a question requiring an examination not only into the common-law rule, but into its basis and its applicability to our system of jurisprudence as applied to lands and interest therein. The particular question of the assignability of the right of re-entry after condition subsequent broken has never been presented to the Supreme Court of this state in a case where the question was necessary to a decision, in so far as we have been able to find.

The doctrine of the nonassignability of titles or interests in lands, not in the actual possession of the grantor, has been quite generally by jurists and text-writers ascribed to a dislike for maintenance. As expressed by Coke:

"The reason hereof is for the avoiding of maintenance, suppression of right, and stirring up of suits, and therefore nothing in action, entrie or re-entrie, can be granted over; for so under colour thereof pretended titles might be granted to great men whereby right might be trodden downe and the weake oppressed, which the common law forbiddeth as men to grant before they be in possession." Coke on Littleton, 213b.

Lord Mansfield says:

"Our ancestors got into very odd notions on these subjects, and were induced by particular causes to make estates grow out of wrongful acts. The reason was the prodigious jealousy the law always had of permitting rights to be transferred from one man to another, lest the poorer should be harassed by rights being transferred to more powerful persons."

During the reigns of Edward I and Edward III repeated statutes were passed against maintenance and champerty, "which arose from the embarrassments which attended the administration of justice in those turbulent times, from dangerous influences and oppression of men of power." 4 Kent's Com. p. 514.

By the Statute of 32 Henry VIII, c. 9, entitled "The Bill of Bracery and Buying of Titles," any one selling or buying a title to property of which for the preceding year he or those under whom he claimed, had not either been in possession or received the rents, was subjected to the penalty of forfeiting the value of the lands, one half to the crown and the other half to the informer; an exception being made were one in possession purchased an outstanding adverse title or claim. Introductory to this statute is a recital of conditions which brought forth its enactment, as follows:

"The King, our sovereign lord, calling to his most blessed remembrance that there is nothing within this realm that conserveth his loving subjects in more quietness, rest, peace, and good concord than the due and just ministration of his laws, and the true and indifferent trials of such titles and issues, as been to be tried according to the laws of this realm, which his most royal majesty perceiveth to be greatly hindered and letted by maintenance, embracery, champerty, subordination of witnesses, sinister labour, buying of titles, and pretensed rights of persons not being in possession, whereupon great perjury hath ensued, and much inquietness, oppression, vexation, troubles, wrongs and disinheritance hath followed among his most loving subjects, to the great displeasure of Almighty God, the discontentation of his majesty, and to the great hindrance and let of justice within this his realm, for the avoiding of all which misdemeanors, and buying of titles and pretensed rights, and to the intent that justice may be more fully and indifferently ministered, and the truth in causes of contention plainly tried between his subjects of this realm; be it enacted, etc."

Lord Coleridge, in referring to the period of English history in which these statutes were passed, says:

"It may be that the danger of the oppression of poor men by rich men, through the means of legal proceedings, was great and pressing; so that the judges of those days, wisely according to the facts of those days, took strict views on the subject of maintenance." Badlaugh v. Newdegate, 1 Q. B. D. 7.

But, independently of these statutes, it is no doubt correct that at common law titles and interests in lands were not assignable, unless the grantor was in possession. This doctrine is usually ascribed to practices of the feudal system, under which livery of seizin "delivery of corporeal possession of the land or tenement * * * was held absolutely necessary to complete the donation." 2 Blackstone's Com. 311. Modern scholars, however, have rejected this explanation, assigning as the true basis of the doctrine the fact that our Anglo-Saxon forbears had no mental conception of title as separate from the subject of title, and consequently mere rights as distinguished from things were not the subject of contract. This view is ably maintained by Prof. Maitland in an article entitled "The Mystery of Seisen." 2 L. Q. Rev. 495.

Whatever view may be taken of the origin of or reasons for the general doctrine of nonassignability of titles to or interests in lands not in possession of the grantor, it is quite clear that none of those reasons existed in the Republic of Texas at the time the common law was adopted as the rule of decision in civil matters. Neither the English statutes nor the English common law upon the subject of maintenance have ever been held to be of force in Texas. Bentinck v. Franklin, 38 Tex. 458. In that case it was said that there is no law prohibiting champerty in force in this state. Whenever the doctrine under discussion has been invoked, the Supreme Court has declined to enforce it, notable examples of which are to be found in upholding the assignability of choses in action generally (Nimmo v. Davis, 7 Tex. 26); the right of expectant heirs (Hale v. Hollon, 90 Tex. 427, 39 S. W. 287, 36 L. R. A. 75, 59 Am. St. Rep. 819; Barre v. Daggett, 105 Tex. 573, 153 S. W. 120); transferability of land held adversely in the possession of another (Carder v. McDermett, 12 Tex. 546; Campbell v. Everts, 47 Tex. 102).

Our Supreme Court has repeatedly pointed out that the evils sought to be obviated by the English rule would be more likely to flourish under conditions here by an adoption of that rule. Chief Justice Hemphill quoted with apparent approval from Stoever v. Whitman's Lessee, 6 Bin. 421, where it is said that—

"From the equality of the condition of persons in this country, there was no danger of maintenance from the influence of powerful individuals, and the abundance and the cheapness of land rendered it necessary to admit of its transfer with almost as much facility as personal property. For these reasons, when deeds and devises of land have been considered in our courts, it has never been made a question whether the grantor or devisor was in or out of possession, and to make it now would disturb what has been looked upon as settled." McMullen v. Guest, 6 Tex. 275.

In Stewart v. Railway, 62 Tex. 246, we read:

"While it is the policy of the courts to discourage groundless and vexatious litigation, the Constitution declares that: 'All courts shall be open, and every person for an injury done him in his lands, goods, persons or reputation shall have remedy by due course of law.' The policy that dictated the English statutes had for its object the protection of the poor against the wealthy and influential, when their rights formed the subject of litigation before the courts. Here the conditions of society in a great measure are very different. To enable the poor in many cases to secure an adjudication upon disputed rights, it is necessary that the right of the attorney to contract for a contingent interest in the subject-matter of the litigation, by way of compensation for professional service, should be recognized."

From the earliest times it has been the policy of our law to permit the free transfer of all classes of property and rights in property, except in those cases where such rights were from their very nature purely personal to the grantor, or where assignability was in contravention of some rule of public policy or statute law.

In Graham v. Henry, 17 Tex. 164, it is said:

"In general, whatever is susceptible of exclusive, individual appropriation may be the subject of bargain and sale; so that property, considered as an exclusive right to things, implies not only a right to use, but a right to dispose of them. Whatever exclusive right a man has in anything, he has a right to dispose of absolutely, as he pleases, provided he makes no disposition of it prohibited by law. It matters not what advances he has made towards acquiring the ultimate dominion, or absolute and complete proprietorship; the moment he has acquired an exclusive interest, though it be but a contingent and executory interest, he may dispose of it at pleasure, subject only to the condition that it is not forbidden by law."

In Johnson v. Newman, 43 Tex. 628, the court had for decision the assignability of the right of citizens of Texas under the Constitution of the republic to acquire land grants. The court say:

"Though at the date of this contract Mitchell had neither a title to the land in controversy nor the certificate under which it has been acquired, still there was, undoubtedly, guaranteed to him by the Constitution the right to this amount of land on his complying with the

requirements to be prescribed by law. This right, though neither real nor personal property in esse, was nevertheless an inchoate right to get that quantity of land out of some part of the public domain at the time, and in the manner to be afterwards provided and determined by the government. It was a right or interest of such character as to be the subject of a contract. Emmons v. Oldham, 12 Tex. 26; Graham v. Henry, 17 Tex. 167; Babb v. Carroll, 21 Tex. 679; Andrews v. Smithwick, 24 Tex. 488."

In discussing the effect of the act of 1840, which made the common law of England the rule of decision in this state in civil matters, Chief Justice Brown, in Grigsby v. Reib, 105 Tex. 600, 153 S. W. 1125, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011, says:

"We conclude that 'the common law of England' adopted by the Congress of the republic was that which was declared by the courts of the different states of the United States. This conclusion is supported by the fact that the lawyer members of that Congress who framed and enacted that statute had been reared and educated in the United States, and would naturally have in mind the common law with which they were familiar."

If we examine the decision of other states, we find that the authorities are not in accord in holding that the right of re-entry after condition subsequent broken is not assignable. The following is from 4 Kent's Commentaries, p. 513:

"The ancient policy which prohibited the sale of pretended titles, and held the conveyance to a third person of lands held adversely at the time to be an act of maintenance, was founded upon a state of society which does not exist in this country."

A very recent edition (1920) of a standard text on real property has this to say:

"In any jurisdiction where one disseised is without the interposition of a statute accorded the right to transfer land in the adverse possession of another, it would seem that the grantor should have the right to transfer the right of re-entry after a breach of the condition has occurred, since after breach his right of entry is absolute, as is that of one disseised." Tiffany on Real Property (2d Ed.) vol. 1, § 86.

The decisions in Pennsylvania and New Jersey support this view. McKissick v. Pickle, 16 Pa. 140; Bouvier v. Railway, 67 N. J. Law, 281, 51 Atl. 781, 60 L. R. A. 750.

The latter case is well considered, and the history of the doctrine of nonassignability is ably reviewed. The rules of the common law were in force in that state in similar manner as under our statute of 1840. The conclusion reached is summarized in the following quotation:

"I think that in any case, wherever the English law against maintenance is not in force, a right of entry for condition broken should be held transferable after breach of the condition."

[3] From the foregoing discussion it is evident that the question of assignability of the right of re-entry after condition subsequent broken should be governed by the same rule which is applied to the assignability of an interest in land in the adverse possession of another. In the latter class of cases, our Supreme Court, as above stated, has spoken in no uncertain terms. In the leading case of Carder v. McDermett, above, the court say:

"The fact that persons out of possession may sell titles which have no foundation in law, and which may be purchased for no other purpose than vexation and the profits of litigation, is no sufficient reason why all lawful owners, ousted of possession, shall be deprived of control over their property. This would be punishing the community in order that some pests might not escape. If the ancient rules of the common law with respect to the nonassignability of mere rights or choses in action and also with respect to the modes of conveyance of real property were still recognized, then there might be some reason for the rule. For at common law no interest could be conveyed, except where the grantor was in actual or constructive possession of the thing granted. And this was on the general ground that such conveyance would multiply suits, and be transferring lawsuits to strangers. Hence a debt or other chose in action could not be assigned (2 Story, 1039), nor could a right of entry or action in real property. This notion against the assignment of choses in action has long since been exploded, but in relation to assignments of rights of entry has more firmly maintained its ground. And under the earlier mode of conveyance by feoffment there was some reason for holding that a right of entry could not be assigned by one out of possession. For, as the livery of seizin was a component part of the transfer by feoffment, it was necessary, in general, that the feoffer should have actual possession at the time of the livery made, although it seems that under some special circumstances, when livery could not be made upon the land, it might be made within view, and was thus effectual to transfer the right of entry, and was so far an exception to the general rule that a right of entry could not be transferred by one out of possession.

"But, under the modern and ordinary forms of transfers, no actual possession is necessary to give validity to conveyances. The seizin by deed draws to it the constructive possession. And if there were any good reason for relaxing the ancient law with respect to the necessity of actual possession to the validity of a transfer, making constructive possession sufficient, there seems no good reason why the mere usurpation of a possession should invalidate a conveyance, when actual possession was not necessary to make it good.

"There are some refined distinctions between the effect of a disseizin and dispossession, and in a very elaborate disquisition appended to the cases of Doe v. Oliver and the Duchess of Kingston, in Smith's Leading Cases, it is maintained that, according to the present state of the law in England, where a title has been reduced by actual disseizin to a mere right of entry, it can be neither devised nor granted, yet, when there is only adverse possession, it may

be devised, and, if there be no maintenance, it may also be conveyed.

"But it is not necessary to trace the effect of these distinctions, as they will not control the decision. For we are of opinion that whether the owner be disseized or dispossessed, or by whatever name his being put out of possession may be denominated, yet that he has such right as will enable him to make a valid conveyance, effectual in law to support an action to try the title. This doctrine exists in some of the states."

In concluding this discussion, it may not be out of place to advert to the fact that the statute which created the action of trespass to try title was adopted at the same session of the Congress that adopted the common law in civil matters. In that enactment all fictitious actions at common law were abolished, and a simple method of procedure was applied to all actions for the recovery of real property. In so far as possession was concerned, that act only required that the plaintiff allege "that he was in possession of the premises or entitled to such possession." R. S. art. 7733(4).

In view of the grounds upon which the English common-law doctrine is predicated, the lack of unanimity in other American states in adopting that doctrine, and the fact that our own Supreme Court has declined to apply the doctrine in cases brought clearly within its purview and application, we are constrained to conclude that the right of reentry after condition subsequent broken should be held assignable in this state.

We conclude that the judgments of the district court and Court of Civil Appeals should be reversed, and judgment rendered in favor of plaintiff in error for the land sued for.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.