**RAILROAD COMMISSION OF TEXAS et al**
**v. RAU.**

No. 7570.

Court of Civil Appeals of Texas. Austin.
April 8, 1931.

Rehearing Denied Jan. 13, 1932.

R. L. Bobbitt, of San Antonio, Jack Blalock, of Marshall, Sloan Blair, of Austin, Marshall O. Bell and Hicks, Hicks, Dickson & Lange, all of San Antonio, and J. V. Allred, Atty. Gen., for appellants.

White, Wilcox, Taylor & Gardner and R. T. Miller, all of Austin, for appellee.

McCLENDON, C. J.

This action was instituted by Gus Rau, the appellee, against the railroad commission, under section 17 of chapter 270 of the General Laws of 1927 (article 911a, § 17, Vernon's Ann. Tex. Civ. Stat.), regulating motorbus transportation of passengers on public highways, for the purpose of reviewing an order of the commission refusing to make permanent a certificate in favor of Rau, authorizing him to operate a motorbus between San Antonio and San Angelo, and making permanent a certificate in favor of Union Bus Company (a copartnership composed of James Amberson and Miller Pendleton) between those cities. The bus company and Joe Amberson, a brother of James Amberson, were permitted to intervene. The contested fact issues in the case arose over an assignment by Rau to Joe Amberson of his rights in the route, and of the ownership of the bus company of the Joe Amberson route. The cause was tried to a jury upon special issues, resulting in findings that the assignment was without consideration and was obtained by fraud, and inferentially, as will be noted below, that Joe Amberson and not the bus company was the owner of the Joe Amberson route. Upon these findings the trial court canceled the certificate of the bus company and ordered the commission to issue a certificate in favor of Rau. The commission, bus company, and Joe Amberson have appealed.

The controlling facts in the case, briefly stated, follow:

The bus company operated a number of bus lines out of San Antonio and other Texas points, and owned terminals at such points. In addition to its own lines, it furnished terminal facilities for other bus operators under the following general arrangement: The bus company provided a station for passengers, posted notices of schedules and the names of the drivers, and advertised the business. Those using the terminals were the recipients of these benefits, and were permitted to use the terminal facilities for receiving and discharging passengers. For this service the operators were charged a terminal fee for each bus leaving and arriving at a terminal; and were permitted to place on their busses pennants or flags of a certain design and color, which had been adopted by the bus company, and was known as the Union Bus Line flag. In 1921, Joe Amberson had a bus line operating out of the bus company terminals and under the Union Bus Line flag between San Antonio and San Angelo; whether he or the bus company was the real owner of this bus line was a disputed issue which will be later considered. Rau was an employee at $100 per month, driving a bus over this line, beginning in the summer of 1921 and terminating in June, 1925, when he purchased a bus from Joe Amberson for $2,000 ($200 cash and the balance in monthly maturing notes); and according to his version, he acquired the San Antonio-San Angelo run in addition. From that time until October, 1926, he operated this bus, using the bus company terminals, and the Union Bus Line flag. In October, 1926, his use of the bus company terminals and flag was discontinued, and he thereafter operated the bus from other terminals in San Antonio and San Angelo. On January 9, 1927, he made some character of arrangement with Schneeman whereby they established what they denominated the "S. A. Line," and adopted a flag known as the "S. A. flag," under which they operated two or more bus-

ses between San Antonio and San Angelo, using hotels or other places as terminals. The business was thus conducted by Rau and Schneeman either as a partnership or each independently from January 9, 1927, until April 14, 1927, when a contract was made between Joe Amberson and Rau and Schneeman, evidenced by two written instruments. In one of these instruments Rau and Schneeman assigned to Joe Amberson "all of our right, title and interest or use, in the Motor Bus business, over the routes, from San Antonio, Texas, to San Angelo, Texas, and intermediate points, and especially the business, which we have heretofore operated, under the trade name of 'S. A. Flag.' " It also provided: "We will peaceably surrender the possession of the above described property, our right, unto him, and will not hereafter run or operate interurban busses, from San Antonio, Texas, to San Angelo, Texas, and intermediate points, without the permission and consent of the said Joe Amberson." In the other instrument simultaneously executed, Schneeman was given a six months' run between San Antonio and Laredo, and Rau was permitted to operate one bus between San Angelo and San Antonio and intermediate points for twelve months from date. It further provided that he "shall be entitled to the terminal service, now usually and customarily furnished on said route by 'Union Bus Line', or Joe Amberson," and that the bus should be run on said route in accordance with the rules then or thereafter enforced by "Union Bus Line," and that cars should be run on schedule agreed upon by Rau and Amberson, and Rau was to keep his car in good mechanical condition and at the end of twelve months "cease to so operate, and surrender his schedule unto the said Joe Amberson, peaceably, and cease to operate between said terminals, in any manner."

These instruments were drawn by Amberson's attorney and were executed by all the parties thereto in said attorney's office. The allegations of fraud were to the effect that these instruments did not express the agreement of the parties leading up to them, in that Rau did not understand that he was conveying his right to operate a business between San Antonio and San Angelo, or that he was agreeing not to operate such bus line after the expiration of the 12-month period; that he did not hear the attorney dictate those provisions to the stenographer; that although he read the instruments before signing them he did not read them carefully, and did not understand English very well. Upon the execution of these instruments he at once abandoned the S. A. flag and proceeded to operate in accordance with these instruments, using the bus company terminals and the Union Bus Line flag. About September, 1927, the use of the terminals was denied him

as a result of some sort of disagreement between him and Joe Amberson, or the bus company, and he ceased operation for a period of about two weeks, according to his testimony, or about four or five days, according to that of appellants. The several versions of this disagreement we deem unimportant. Rau at once appealed to the bus division of the railroad commission, and the superintendent of that division telephoned to one of the members of the Union Bus Company partnership, instructing him to put Rau back on his run. This instruction was complied with and Rau continued to operate under the April 14th agreement until beyond the 12-month period. In July, 1927, shortly after the motorbus law went into effect, both he and the bus company applied for certificates under the proviso of section 5 of the act (Vernon's Ann. Civ. St. art. 911a, § 5), as having operated between the points named on January 11, 1927, and continuously thereafter. Each protested the application of the other, and upon hearing by the commission the temporary certificate of Rau was canceled and that of the Union Bus Company made permanent. Just what the issues were before the railroad commission is not disclosed by the statement of facts. The opinion of the commission and the transcript of the evidence at the commission hearing were excluded upon objection by Rau. These proceedings are embodied, however, in the bills of exceptions, and it appears therefrom that the contest there was based upon the ownership of the route; the commission after hearing the evidence finding that Rau had parted with all of his interest.

There are several contentions by the respective parties that we shall consider before discussing what we regard as the controlling issues in the case.

▮ Appellants contend that the transcript of the record in the railroad commission hearing was improperly excluded on the ground that the proceeding provided for in section 17 of the act is merely a review of the correctness of the order of the commission based upon the record before it. This contention is supported by a number of citations from other states, the statutes of which are different from our own, which provides that the proceeding "shall be tried and determined as other civil causes in said court." Similar provisions appear in R. S. arts. 6059 and 6453, giving the right of appeal to the courts from orders of the railroad commission in other matters; and the holding has been, wherever the question has arisen, that the proceeding in the district court is a trial de novo, and not merely a review of the railroad commission's action upon the record made before the commission. Each party is permitted to introduce such evidence as is pertinent to

the controversy, regardless of whether it had been introduced before the commission, as in all other de novo trials.

■ The opinion of the commission is important only as showing the grounds upon which it based its action.

■ The transcript of the evidence before the commission is not admissible as such. It might become admissible as secondary evidence where a proper predicate is laid; and it may be employed for impeachment purposes, which appears to have been freely done in this case.

In the view we take of the case the exclusion of the commission's opinion becomes unimportant.

■■ The commission pleaded nonjoinder of necessary parties, in that Rau did not implead the bus company. Clearly the latter was a necessary party to a proceeding in which a certificate issued to it was sought to be canceled. For an analogous situation, see Chappell v. Rogan, 94 Tex. 492, 62 S. W. 539. The question, however, is unimportant, since both the bus company and Joe Amberson were permitted to intervene, thus bringing before the court all parties whose rights were involved. Whether the bus company came in voluntarily, or was brought in by process, is immaterial.

■■ Appellee contends that the railroad commission was without power to determine the validity of the contract between Rau and Joe Amberson. This contention we think is correct. The powers granted and duties conferred upon the railroad commission by the act in question are very ample as regards the granting of certificates of convenience and necessity, and the regulation of those engaged in the traffic. We find nothing in the act, however, which attempts to confer any power upon the commission to adjudicate the contractual rights of individuals. This is aside from any constitutional question which might be involved if such power were attempted to be conferred. Numerous authorities might be cited in support of this view. We merely refer to the following: Mosel v. S. A. & A. P. Ry. Co. (Tex. Civ. App.) 177 S. W. 1048; N. Y. Central Ry. Co. v Public Utilities Commission, 119 Ohio St. 381, 164 N. E. 427; A., T. & S. F. Ry. Co. v. Railroad Commission, 173 Cal. 577, 160 P. 828, 2 A. L. R. 975. However, we regard this question also as unimportant, since all parties interested were before the trial court, a tribunal with ample powers to adjudicate the contractual rights of the parties.

This brings us to what we consider the controlling questions in the case, namely: (1) The proper construction of the proviso in section 5 of the Motorbus Act; (2) the sufficiency of the evidence to support the findings (a) of fraud and (b) of want of consideration in the assignment contract; and (3) the validity of the order in awarding certificate to the bus company—which we will consider in the named order.

■ 1. It is the contention of appellee that where a party has operated a motorbus line on January 11, 1927, and continuously thereafter, he is entitled as a matter of right to a temporary certificate or permit and to have same made permanent, by complying with the provisions of the act; and that such facts appearing, the commission has no discretion to deny such certificate, its powers and duties being ministerial and mandatory. Appellants contend, on the other hand, that the same discretion is reposed in the commission in passing upon applications of this character as in those generally under the act; and that review of the commission's order in denying or granting such certificate may be had only where that discretion has been abused.

We sustain appellee's above contention. We think the act is clear and unequivocal, and that the duty to issue the temporary certificate and thereafter to make it permanent is dependent solely upon the existence vel non of the fact of having in good faith operated on January 11, 1927, and continuously thereafter. Similar provisions appear in the acts of other states, and wherever the question has arisen it has been held that such provisions do not violate any constitutional inhibition, and are both reasonable and salutary. See, in this connection, the following authorities: Ex parte Sepulveda, 108 Tex. Cr. R. 533, 2 S.W.(2d) 445; Ex parte Sparks, 108 Tex. Cr. R. 619, 2 S.W.(2d) 449; Cyclopedia of Automobile Law, vol. 1, p. 117, § 18, and authorities there cited.

The purpose of such provisions is set forth with particularity and clearness in Gruber v. Commonwealth, 140 Va. 312, 125 S. E. 427.

■ 2. (a) The record shows without controversy that the contracts were supported by a valuable consideration, in that under them Rau and Schneeman obtained a valuable right, namely, to use the Union Bus Line flag and the bus company terminals, Rau for a period of 12 months between San Antonio and San Angelo, and Schneeman for a period of six months between San Antonio and Laredo.

■ 2. (b) Upon the issue of fraud, we have very serious doubts whether the evidence will support any finding of deceit, bad faith, or overreaching on the part of Joe Amberson. Ample opportunity was afforded Rau to read the contracts, and according to his testimony he did read them before signing them. Independently of this, it conclusively appears from the evidence that Rau within a few days after signing the contracts submitted them to his brother-in-law, who was a former

county judge, and obtained full information as to the contents of the documents. He continuously thereafter operated his line under the contract, receiving all the benefits therefrom, and even enforced those rights by appeal to the railroad commission when he felt them infringed by Joe Amberson or the bus company. These facts we think clearly eliminate from the picture one of the essential elements of fraud, namely, that a misstatement or fraudulent device must be acted upon by the defrauded party.

Additionally, the issue of fraud is eliminated by the following: The remedy of rescission of a contract for fraud is only an alternative and an equitable one, must be exercised with reasonable promptness under the circumstances after discovery of the fraud, and the defrauded party must put the other party in statu quo as nearly as can be done under existing circumstances. We think the above facts clearly establish the loss of the right of rescission, if it ever existed. If appellee desired to exercise this right he should have done so promptly after he was advised of the fraud, and surrendered back to Joe Amberson the rights he acquired under the contract. This he did not do, but, as stated above, he continued to operate under the contract, receiving all the benefits therefrom. He cannot, therefore, now repudiate the contract, but is relegated to his right of action for damages for the fraud, if he can show himself entitled thereto in a proper action therefor.

It follows from the above that appellee having assigned his interest in the route by valid contract, he is not entitled to a certificate and the order of the railroad commission in that regard is correct and should not be disturbed.

3. The specific question submitted to the jury relating to the bus company's certificate, which was answered in the negative, was whether the bus company had continuously operated a bus line between the points in question beginning January 11, 1927. The real fact question involved in this issue was as to the ownership of the bus line between San Antonio and San Angelo; that is, whether it was owned by Joe Amberson or by the bus company. The order of the railroad commission in this regard, we think, should be sustained upon two grounds.

, In the first place, upon conclusive showing that appellee has no interest in the line, he likewise has no interest in the controversy, and the issue presented by him to the district court becomes a moot question.

Secondly. Ownership of the line, whether in Joe Amberson or in the bus company, we think unimportant under the undisputed facts. Both he and the bus company were before the court and all of the

parties interested testified to the effect that the line belonged to the bus company and not to Joe Amberson, and that the latter was merely an agent of the former. The record conclusively shows that either the bus company or Joe Amberson was entitled to a permanent certificate. Whether this was applied for and granted in the name of the bus company or Joe Amberson is immaterial we think under the undisputed evidence that Joe Amberson consented and was still consenting to this method of obtaining the certificate.

The trial court's judgment is reversed, and judgment is here rendered for appellants.

Reversed and rendered.

On Appellees' Motion for Rehearing.

Appellees have filed an elaborate motion for rehearing, some of the points urged in which we deem it necessary to discuss:

1. It is urged that the contract of April 14, 1927, was severable as to Rau and Schneeman, and that the consideration received by Schneeman could not support the contract in so far as Rau is concerned. This proposition is correct. The contract itself provides that the undertakings of Rau and Schneeman are several.

2. It is insisted that the jury finding that Rau received no consideration for the April 14, 1927, contract is supported by the evidence of Rau to the effect that when he purchased from Joe Amberson the Buick bus in June, 1925, it was only worth about $1,200, and that the $2,000 he paid included the right to use the Union Bus stations and the Union Bus flag. Rau so testified. However, the record shows without contradiction that this right was terminated on October 20, 1926, and Rau ceased to use the Union Bus flag or stations from that time until after he signed the contract of April 14, 1927. His rights under the June, 1925, contract were in dispute, and the settlement of that dispute was a sufficient consideration for the April 14, 1927, contract.

The following points were not urged in the brief, but are presented for the first time on appeal in the motion.

3. That the contract of April 14, 1927, was void at common law as being in restraint of trade.

The contention is that no physical property passed by the contract; that Joe Amberson had no intention of using, and did not use, the "S. A. Flag" (a registered trade-mark); and that the only real purpose and effect of the contract was to eliminate Rau as a competitor. The principle contended for is well established and was recently applied in this court in Potomac Fire Ins. Co. v. State, 18 S.W.(2d) 929 (error ref.).

What the instrument attempted to transfer is set out in quotation in our original opinion. There can be no question but that this

language passed every right to the operation of motor busses between the two points which Rau possessed, and which he had a legal right to dispose of, unless the contract was void, as being in restraint of trade.

Appellee contends that Rau had no such right (eliminating the "S. A. Flag" upon the above grounds), since the motorbus law was not then in effect, and his right to run a bus line was derived from the general right to engage in a business that was not inhibited, and was a right common to all.

The motorbus law was approved April 1, 1927 (thirteen days before the contract was executed), but did not become effective until June 14, 1927 (Vernon's Ann. Civ. St. art. 911a; Vernon's Ann. P. C. art. 1690a). It was originally passed in the House February 15, 1927, and after a number of amendments in both Houses was finally passed upon adoption of free conference committees' report March 14, 1927. Section 5 of the law provides: "Any right, privilege, permit, or certificate held, owned or obtained by any motor-bus company under the provisions of this Act * * * may be sold, assigned, leased or transferred, or inherited," with the proviso that such sale, etc., have the approval of the railroad commission. At the time of the transfer, Rau had an established business; he had operated continuously from January 11, 1927, with the then inchoate right, which would become absolute upon the taking effect of the act, to obtain an assignable certificate, provided he continued to operate the line. We think this inchoate right was more than the general right, inherent in every one, to engage in the motorbus business. It was exclusive in Rau alone; as such it was a valuable right, and in the absence of some inhibition imposed by statute or rule of public policy, it was, we believe, under the generally announced policy of this state, the subject of sale. Graham v. Henry, 17 Tex. 164; Manchaca v. Field, 62 Tex. 136; Stiles v. Hawkins (Tex. Com. App.) 207 S. W. 89; Perry v. Smith (Tex. Com. App.) 231 S. W. 340; Caruthers v. Leonard (Tex. Com. App.) 254 S. W. 779.

While not expressly so stating, the contract was manifestly made in contemplation of the motorbus law, which had been pending before the legislature for several months, and had already been passed and approved by the Governor.

The following rule is laid down in 13 C. J. p. 424: "A contract for an act prohibited by the existing law, but which is shown to have been made with reference to the contemplated procuring of a special statute making the act valid, the enactment of which was actually procured before the contract was performed, is not to be regarded as illegal." The authorities cited support the text.

But aside from this, and whatever character may be ascribed to the right at the date of the transfer, it unquestionably ripened into full fruition upon the effective date of the act. As we have already seen, the consideration moving to Rau was the use for one year from April 14, 1927, of the Union Bus terminals, terminal service, and flag. Rau continued to operate under the contract, accepting all the benefits thereof, and even invoking the aid of the motorbus division of the commission to enforce his rights, during the remainder of the year after the act became effective, June 14, 1927.

Clearly, we think, these acts constituted a ratification and confirmation of the contract after the act became effective and his rights in the certificate became fixed and absolute. The legality of the contract must, therefore, in any event, be tested by the rights of the parties after the act became effective.

This view we think brings the contract within the purview of the general common-law rule to the effect that an ancillary contract in reasonable restraint of trade is valid.

The pertinent rule is thus stated in 13 C. J. p. 475: "A restraint to be reasonable must be such only as to afford a fair protection to the interests of the party in favor of whom it is given and not so large as to interfere with the interests of the public. Subject to this qualification it may extend to all the territory in which the business has been carried on or wherein the covenantee's trade is likely to go."

The agreement was limited to operating a bus line between the two points covered by the business which was assigned.

There is still another view under which Rau may be precluded from setting up illegality of the contract. The latter was entirely executed on the part of Amberson, and Rau had received the full consideration for his bargain. Amberson was not seeking to enforce the provision against competition, but was merely asserting title to the certificate. If, as we think, the title to the certificate passed in any event when the act became effective, then under elementary principles Rau could not recover the title upon the ground that the contract was illegal. 13 C. J. p. 496. It is unnecessary, however, to pass upon this question, and we therefore do not rest our decision upon it.

4. The further point is made that the contract is in violation of our anti-trust laws. If we are correct in holding that it is not void under the common law, then it does not come within the inhibition of our anti-trust laws under the holdings in Gates v. Hooper, 90 Tex. 563, 39 S. W. 1079, and Malakoff Gin Co. v. Riddlesperger, 108 Tex. 273, 192 S. W. 530.

The motion is overruled.

Overruled.